**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 08-238-DLB**

**RUBY SHEFFEY, Administrator**
**of the Estate of Leroy Hughes**                                        **PLAINTIFF**


**vs.**                          **MEMORANDUM OPINION AND ORDER**


**CITY OF COVINGTON, ET AL.**                                  **DEFENDANTS**

* * * * * * * * * * * * * * * * *

Plaintiff Ruby Sheffey ("Sheffey"), as Administrator of the Estate of Leroy Hughes ("Hughes"), initiated this § 1983 action against Defendants City of Covington, Officer Ron Allen, Officer Robert Bacon, Officer Eric Higgins, Officer Steve Bohman, Sergeant William Webster and Unknown Police Officers, alleging constitutional violations of Decedent's Fourth Amendment right to be free from the use of excessive force and Fourteenth Amendment due process rights. Against Defendants Allen, Bacon, Higgins, Bohman, Webster and the Unknown Officers, Plaintiff has also brought state law claims for battery and negligence. The claims brought against each of the Defendants relate to Decedent's death on December 3, 2008, after he was tased several times by certain Covington police officers. The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

This matter is before the Court on Defendant Officer Steven Bohman's Motion for Summary Judgment (Doc. # 56), Defendants Sergeant William Webster's and Officer Eric

Higgins' Motion for Summary Judgment (Doc. # 58), Defendant City of Covington's Motion for Summary Judgment (Doc. # 59) , and Defendants Officer Ron Allen's and Officer Robert Bacon's Motion for Summary Judgment (Doc. # 60). The motions have been fully briefed (Docs. # 56, 58, 59, 60, 67, 71, 72, 73, 74), and the matter is now ripe for review. For the reasons stated herein, Defendant Officer Steven Bohman's Motion for Summary Judgment (Doc. # 56), Defendants Sergeant William Webster's and Officer Eric Higgins' Motion for Summary Judgment (Doc. # 58), Defendant City of Covington's Motion for Summary Judgment (Doc. # 59) , and Defendants Officer Ron Allen's and Officer Robert Bacon's Motion for Summary Judgment (Doc. # 60) are hereby **GRANTED**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This matter arises from an incident that occurred on Wednesday, December 3, 2008, in which Leroy Hughes entered a school zone in Covington carrying a concealed handgun at approximately 11:00 a.m.  After a witness called 911, several police officers arrived at the scene.  Hughes failed to comply with the officers' instructions, and a forcible arrest occurred, resulting in Hughes being tased several times.  Shortly thereafter, Hughes stopped breathing and was pronounced dead at St. Elizabeth Medical Center in Covington.

### A.  Background Relating to Leroy Hughes

At the time of his death, Hughes was fifty-two years old, six feet six inches tall, and weighed 410 pounds.  Hughes had previously served in the military but was discharged from service in 1975 under other than honorable conditions.  Hughes' mother, Ruby Sheffey, believed his discharge was due to a "nervous breakdown."  (Doc. # 50-1, at 8). In 1979, Hughes was diagnosed with paranoid schizophrenia.  Prior to his death, Hughes

2

lived alone on Welsh Drive at the City Heights housing complex in Covington, Kentucky for twenty-five years.

In the summer of 2007, Hughes took possession of a handgun from his sister, Cynthia. Apparently, she gave him the handgun and asked him to hold it for her until a friend of hers could pick it up. However, no one ever came to retrieve the gun from Hughes. Concerned about Hughes possessing a handgun in light of his mental condition, Sheffey asked Hughes to bring her the handgun on multiple occasions, but he did not comply. Although it will never be known for certain, on the day Hughes died, Sheffey believed Hughes was on his way over to her house to deliver his rent receipt and return the gun.

**B.     December 3, 2008**

On Wednesday, December 3, 2008, at approximately 11:00 a.m., Hughes left his apartment with the loaded handgun he had received from his sister and walked north on Benton Road toward Highland Pike. At the time, he was wearing two t-shirts, a sweater, a hoodie, three pairs of pants, two pairs of socks, and steel toe boots.

Around the same time, George Beasley had just pulled into the driveway of his girlfriend's condominium on West 19th Street, near Benton Road. As he got out of his car, he saw Hughes walking down the street holding the gun in his hand. As he continued watching, he observed Hughes take the clip out of the gun and put it in his pocket. When a bus pulled up nearby, Hughes quickly put the gun in his other pocket. Eventually, Hughes sat down on a guardrail for about four or five minutes. Considering Hughes' actions suspicious, Beasley called 911. He described Hughes as an "African American

3

male man with gray jogging pants with a brown jacket with a hoodie on it." (Doc. # 58-10, at 2). He told the dispatcher that Hughes was "carrying a gun," and that he took the gun out, took the clip out, and put the gun in one pocket and the clip in the other. (*Id.*).

Dispatch put out the call to Covington Police Officers Steve Bohman and Eric Higgins stating, "I've got a subject with a gun. It's going to be a male Black in his thirties wearing a gray hoodie and pants and a brown sweater jacket. He has a handgun. He took the clip out and put it in one pocket and the gun in the other pocket." (*Id.*). Consistent with the call, the dispatch report read: "MALE BLACK 30S, GREY HOODIE, GREY PANTS, BROWN SEWATER [SIC] HAS HANDGUN, TOOK CLIP OUT PUT IN ONE POCKET AND THE GUN IN THE OTHER." (Doc. # 58-13, at 1). Several other officers, including Officer Ron Allen, Officer Robert Bacon and Sergeant William Webster, heard the dispatcher's communications over the radio and responded to the area to provide backup assistance. As Officer Allen searched the area, he contacted the dispatcher to seek clarification regarding the subject's description.

Meanwhile, Hughes left his position on the guardrail and continued walking toward Highland and Benton, where two schools–Glenn O. Swing Elementary and St. Augustine Elementary–are located. Beasley then made another call to 911 when he witnessed the police cruisers pass Hughes. He informed the dispatcher that Hughes was walking on Benton towards "the school on the main street." (Doc. # 58-10, at 5). Dispatch put out another call stating: "All units at Highland and Benton. We just received an update. The subject is now walking down Benton Road. All units, he should be walking towards Glen O. Swing." (*Id.* at 8).

Officer Allen was the first to spot Hughes, as he noticed a man matching the description wearing a gray hoodie and brown sweater jacket. Allen radioed dispatch that he had contact with the subject. After stopping, Allen exited his vehicle, stood behind his open car door for cover and drew his gun. Allen ordered Hughes to show his hands and get down on the ground. Initially, Hughes did not react to Allen's commands, and Allen continued to shout "show me your hands, get down on the ground." (Doc. # 46-1, at 9). Finally, Hughes started to move, but he still did not comply with Allen's orders. Hughes began to shuffle back and forth, from toe to toe on the balls of his feet, and reached his hands toward his waistband in an up-and-down motion and repeated the words, "dynamite, dynamite." (*Id.*). Recognizing that this was an atypical reaction, Allen advised dispatch that the subject was noncompliant and possibly a "Signal 2," which means the subject is either mentally disturbed or under the influence of drugs.

At the same time Allen arrived at the scene, Officer Bacon parked his cruiser behind Allen's, exited the vehicle, drew his gun, and stood behind the open door of cruiser for cover. Bacon also told Hughes to show his hands. Upon observing Hughes' behavior, Bacon thought he might have been high on drugs, possibly drunk, or that he was deaf.

Very shortly thereafter, Officers Bohman and Higgins also arrived on the scene in separate police cruisers. Bohman began to direct traffic that had formed in the area, instructing vehicles to turn around in the parking lot of Glenn O. Swing School and vacate the area. After he cleared the area, he took a position a few feet to Bacon's left. Higgins exited his cruiser and took a position on the sidewalk near the houses on Highland Avenue.

Allen then began to move closer to Hughes. Allen repeated his verbal command, this time in a lower volume, that Hughes get down on the ground, and he also used a hand

5

gesture signaling that he wanted Hughes to get down. Hughes again ignored Allen's orders and proceeded to shuffle his feet, slide his hands up and down on his waistband and mutter "dynamite, dynamite."[1] (Doc. # 46-1, at 10). Bacon followed Allen's lead, providing backup as they approached Hughes.

At this point, Allen advised Bacon to reholster his gun and take out his taser, a less than lethal weapon. Again, Allen gave orders for Hughes to show his hands and get down on the ground.[2] Suddenly, Hughes stepped off the curb and said, "F--- it, I'm out of here." (*Id.* at 13). He began walking aggressively toward Officer Bacon with his fists clenched, and Officer Allen ordered Bacon to tase Hughes.[3] At that same moment, Bacon, fearing for his own safety, began to back up and decided to fire his taser regardless of Allen's instruction. Bacon deployed his taser in probe mode and struck Hughes in the upper left shoulder/chest area. Hughes reached his hand up towards his chest as if to pull the probes out and said, "ouch." (*Id.* at 14). Otherwise, the officers believed that the taser had no perceptible effect on Hughes, as it did not cause any neuromuscular incapacitation.[4]

---

[1] One witness described the situation: "[Hughes] was suspicious. He acted like he wanted to get into his pockets, but he didn't. Then he kept acting like he was – like he knew what he was doing and he was getting ready to do something but he wasn't sure if he should have or if he was going to or not. ... So he acted pretty – pretty weird." (Doc. # 75-1, at 5).

[2] Two witnesses testified that Hughes did put his hands up during the initial encounter. However, the first witness only had a view of Hughes' backside and testified that one of Hughes' hands kept disappearing from her view. The other witness stated that, although he had his hands up, he kept moving one hand down a little bit. Clearly, this testimony is consistent with the officers' testimony that Hughes kept reaching for his waistband. Furthermore, both witnesses testified that Hughes refused to comply with the officers' orders to get on the ground.

[3] Despite Allen's and Bacon's testimony that Hughes came at Bacon with his fists clenched, none of the other witnesses corroborated this testimony. Many of the witnesses simply stated that Hughes began walking towards Bacon or appeared to be attempting to leave the scene. However, one of the witnesses stated that as Hughes walked towards Bacon, "it looked like if [Hughes] could have got close enough, he was going to assault [Bacon]." (Doc. # 75-1, at 1).

[4] Several witnesses also testified that the first tasing had no effect on Hughes.

Hughes took another step towards Bacon, and Allen told Bacon to cycle the taser again, meaning to activate a second round of electric current through the prongs that had already been deployed. Bacon complied and cycled the taser again. After the second cycle, Bacon dropped his taser because he believed it was not effective.

At about the same time, Hughes reached into his pocket and threw a white object–which turned out to be a box of ammunition–towards Allen and said, "F--- it, it's not loaded." (Doc. # 47-1, at 17). At that point, Officer Higgins, who was standing at an angle and slightly behind Hughes, fired his taser in probe mode at Hughes' back. Again, the taser appeared to have little to no effect, as it only caused Hughes to turn momentarily toward Higgins and away from Allen and Bacon. After this initial tase, Higgins switched out the cartridge on his device because he was not sure if it was making contact to complete the circuit. He then deployed his taser in probe mode at Hughes' back for the second time.

Higgins noticed that Hughes was still reaching for his waistband and warned the other officers, "He's still reaching!" (Doc. # 55-1, at 8). Bohman explained his reaction to the situation in this way:

> [W]hen Officer Higgins stated, "He's still reaching," I perceived that as he [Hughes] was trying to get to a firearm, which we had a report that he was armed. So at that time I was really afraid that we were going to get to the point where it was going to be a deadly-force situation. And based upon the children at St. Augustine School in the windows of the school, the children at Glen O. Swing, that were on a corner of the playground that we could see where we were at, the people at Parton Brothers, there was residents on the porch here at this residence, just a combination of all of that ... So fearing that–in our training, whenever we–one of the things we have to consider when using our firearms is what's behind the suspect or the individual. So again, I was fearing that we were not going to have a clear shot.

(*Id.* at 9). Thus, Officers Bacon and Bohman decided to physically force Hughes down to the ground in order to avoid a deadly force situation. As Hughes' attention was turned

towards Higgins, Bacon and Bohman grabbed Hughes' arms to keep him from reaching for a weapon and tried to twist him down to the ground. However, because of Hughes' large size, they were unsuccessful in doing so. When Hughes started to move forward, Bohman saw an opportunity to perform a leg sweep and, with Bacon's help, was able to get Hughes to the ground. Upon impact with the ground, Bohman lost control of Hughes' left hand, and Hughes was able to tuck it underneath his stomach.

Once Hughes was on the ground, Bohman and Bacon tried to gain physical control over Hughes in order to handcuff him with the help of Officers Allen and Higgins and Sergeant Webster, who had just arrived on scene. The officers also gave Hughes verbal commands to put his hands behind his back. However, Hughes kept his hands underneath his stomach, trying to push himself up off the ground. He was also reaching towards his waistband with both hands, where the officers believed he had a firearm.

At one point, Bacon managed to get a hold of Hughes' right wrist, but Hughes pulled Bacon's hand toward his mouth and attempted to bite Bacon's hand. Bacon yelled to the other officers, "He's biting!" (Doc. # 47-1, at 22). Sergeant Webster then lifted up Hughes' shirt[5] and used his taser to drive stun Hughes in the lower back. When that had no effect, he drive stunned Hughes in the right hip. However, because Bacon let go of Hughes when he tried to bite him, Hughes was able to grab Sergeant Webster's hand and the taser lost contact with Hughes. When this happened, Bacon actually received the jolt from Webster's tase. Officer Higgins also used his taser in drive-stun mode, placing the device directly against Hughes and over his clothing, in the area between his shoulder blades.

---

[5] When Webster arrived on scene, the first thing he noticed was that Hughes' was wearing especially heavy clothing and believed that was the reason Officers Bacon's and Higgins' initial tasings were ineffective.

All five of the officers continued struggling to gain control of Hughes' arms. As soon as they would gain some leverage and get one of his hands behind his back, Hughes would fight and move his hands back to underneath his stomach and reach towards his waistband or try to push up off the ground. Observing that the tasings had no effect on Hughes, Higgins tased him an additional two times. Finally, Higgins saw an exposed patch of skin on Hughes' lower back. Just as Webster, Higgins thought that the tasings were having no effect because of Hughes' thick clothing, so he tased Hughes one final time on the patch of exposed skin. Hughes again failed to comply with the officers' commands, and, thus, Higgins turned off the device knowing that the taser was ineffective.

By this time, Webster had used his taser in drive stun mode two more times. On another occasion, however, Webster had difficulty maintaining contact between the taser and Hughes' body long enough for the taser to work effectively, because Hughes continued to move around as he resisted the officers and tried to get up off of the ground. Webster also realized the taser was ineffective in gaining Hughes' compliance, and he ceased using it at this time. Between Higgins and Webster, they cycled their tasers in drive stun mode a total of eight times in forty-seven seconds while Hughes was on the ground.

Finally, the officers were able to gain control over Hughes long enough to handcuff one of his arms. Although, Hughes pulled his arm away again and began moving it toward his waistband. The struggle continued and, eventually, the officers placed a separate set of handcuffs on Hughes' other arm. Given Hughes' size, they had to link three separate handcuffs together in order to cuff Hughes' hands behind his back. Hughes continued to kick his legs, so the officers placed shackles on them. Witnesses testified that it took approximately five minutes from the time the officers took Hughes to the ground until the

time he was eventually handcuffed and fully restrained.[6]

Once Hughes was fully restrained, Allen noticed he had a cut on his hand and walked over to another officer's cruiser to treat it with disinfectant wipes. Meanwhile, Webster performed a pat-down search of Hughes and found a handgun with a live round in its chamber, a speed loader, three magazines loaded with bullets, three boxes of ammunition, assorted loose bullets, and a knife in Hughes' pockets. Higgins attempted to speak with Hughes to find out his name and other identifying information, but Hughes only looked at him and did not respond. Hughes was still conscious and breathing at this point–he was moving his head, his eyes focused on Higgins when spoken to, and he had snot bubbles coming from his nose. Some of the officers then rolled Hughes over and propped him up in a seated position, taking turns letting Hughes lean against their legs.

When Officer Allen returned from treating his wound, he noticed that Hughes' eyes were closed and he was breathing heavily. He administered a sternum rub to elicit a response from Hughes but was unsuccessful. Sergeant Finan, who arrived at the scene during the struggle, called the Dispatcher and requested an ambulance at the scene.

Once the ambulance arrived, the officers helped the emergency medical technicians (EMTs) place Hughes onto a stretcher and then into the ambulance. Bacon accompanied Hughes to the hospital. Once they were in the ambulance, Bacon observed that Hughes had stopped breathing. He and Bohman helped the EMTs perform CPR and chest compressions before additional medical personnel arrived. Hughes was then transported

---

[6] One witness testified it took five minutes. Another witness testified it took five or ten minutes. Finally, one witness testified it took two or three minutes but stated that "they were down there for awhile." (Doc. # 76-1, at 6).

to St. Elizabeth Medical Center in Covington where he was pronounced dead at 12:17 p.m., a mere seventy-five (75) minutes after the initial 911 call.  The autopsy report done by Charles L. Stephens, M.D. of the Northern Kentucky Regional Medical Examiners' Office stated: "Death, in my judgment, is due to a cardiac event, due to myocardial hypertrophy and coronary atherosclerosis.  The pattern of circumstances with contributing morbid obesity and hypertrophic heart disease, and the use of electrical stun devices suggests that this death could be assigned to the excited delerium syndrome."  (Doc. # 58-3, at 1).

     **C.**      **Information Regarding Tasers**

The Covington Police Department (CPD) only issues tasers to officers who are duly trained and certified to use the devices.  The five Defendant officers herein had received the necessary training and certification to carry tasers.

Tasers are handheld, battery operated devices that feature a cartridge that holds two probes attached to long wires.  Tasers are generally considered less than deadly force and are designed to assist police officers in controlling resisting subjects by delivering a small electrical charge to the subject's body using one of two modes.  In probe mode, the officer pulls the taser's trigger, causing compressed nitrogen to release the two probes from the taser's cartridge at a subject who is no more than twenty-five feet away.  Once released, the trajectory of the probes is such that for every seven feet of distance between the officer and the subject, there will be a one foot spread between the probes when they meet the subject.  A successful deployment of the taser in probe mode will complete a circuit and deliver an electrical charge to the body sufficient to result in the temporary

neuromuscular incapacitation of the subject.  In other words, the subject's muscles "lock up" or "become rigid," and the officer will then have a brief opportunity to gain control of the subject.  (Doc. # 51-1, at 11).

However, there are a number of factors that can cause the deployment of the taser in probe mode to fail.  For example, the probes may land too far apart to complete a circuit or, depending on the subject's clothing, the probes might not be able to penetrate the clothes and the charge cannot be delivered to the subject's body.  Similarly, if the probes hit an area of the body that has a thick epidermal fat layer, the charge may not be delivered past that layer and, therefore, would not incapacitate the subject.  Moreover, the delivery of the electrical charge depends on both wires landing on the subject, both wires remaining intact and functioning properly, and the probes hitting an area of the body with sufficient muscle mass to have an impact on muscle movement.

Tasers may also be deployed in drive stun mode.  In this mode, the officer removes the cartridge that contains the two probes, places the taser directly against the subject's body, preferably on a part of the body that contains a large nerve bundle, and pulls the trigger.  If successful, the taser will deliver an electrical charge to the area of the body that is in contact with the taser, causing an intense burning sensation that will hopefully cause the subject to surrender.   The drive stun mode does not cause neuromuscular incapacitation, but rather operates as a pain compliance tool only.  Since the drive stun mode does not cause neuromuscular incapacitation, the subject may continue to struggle even if the taser has been effectively discharged.  If the subject moves during a struggle, the taser may lose contact with the body and, thus, lose its effectiveness as a pain compliance tool.

## D. Training Provided by the City of Covington

Each officer received training regarding interaction with emotionally disturbed persons (EDPs), including the use of tasers with EDPs, at the Department of Criminal Justice Training Academy at Eastern Kentucky University ("Police Academy"), during a six-month probationary period where each officer trained with a Field Training Officer (FTO), and in an eight-hour taser training course taught by Sergeant Chris Twehues, a certified taser trainer.[7] Each year, the officers must maintain their taser certification by taking a written test. Moreover, Sergeant Twehues testified that during the years 2000 and 2001, all of the police officers employed with the CPD at that time took a course entitled "Homeless 101" that taught officers how to recognize and deal with EDPs, including those suffering from excited delirium syndrome.

During the officers' basic training at the Police Academy, they took a course entitled "Tactical Responses." The course included a two-hour training on how to deal with EDPs. The course objectives included: (1) identify behaviors associated with mental illness which a police officer may encounter on duty; (2) identify techniques that aid police officers in

_____

[7] Despite the officers' training, while being deposed in March 2011, some of the officers could not recall whether they had been trained in dealing with EDPs or the specifics of that training. Sergeant Webster testified that in the 1990s, he attended an eight-hour seminar given by the Homeless Coalition of Cincinnati that covered how to deal with EDPs. He also testified that he learned when dealing with an EDP, you should avoid being confrontational, try to de-escalate the situation, and calm the person down. Moreover, Webster testified that occasionally the sergeants discuss EDPs in their roll-call training. Officer Allen testified that, although he could not recall any specific training on EDPs, his response at the scene with Hughes–to lower his voice and use a lower level of force–was learned through his experience and training. Officer Bacon described a 40-hour continuing education course called Hostage and Crisis Negotiation that included training on dealing with EDPs and was able to articulate how to confront such persons in different situations. Officer Bohman specifically remembered a two-hour training course at the academy dealing with tactical responses to EDPs. Bohman was trained to watch for warning signs indicating that persons are not in the right state of mind, keep your tone down, try to be nonconfrontational, and keep your commands simple. He also testified: "And one of the big things they stress is, if [the EDPs] are armed they're going to be very unpredictable, so at that point we need to disarm them as quickly as possible so they don't hurt themselves or others." (Doc. # 55-1, at 5).

communicating with and controlling EDPs; and (3) identify officers' legal duties and alternatives for dealing with EDPs.

Additionally, the taser training course included two presentations on how to deal with non-compliant EDPs taken from actual incidents in Kentucky and Ohio. The course also provided scenario training in dealing with EDPs during which the trainees act the roles and the instructor provides a critique of whether the officers communicated appropriately with the EDPs and among themselves. Furthermore, Sergeant Twehues taught that EDPs may not comply with verbal commands following the taser cycle and lack of reaction to a taser cycle may indicate poor or no connection, low probe spread, or low muscle mass contact. If that occurs, the officer should reload and target a different area, try one in drive stun mode with a cartridge in place, or consider other force options such as open hand control. Finally, the six-month probationary period with the FTO also provided significant experience in dealing with EDPs because of the officers exposure to the large number of mentally disabled individuals who inhabit the streets of Covington.

## II.    ANALYSIS

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

14

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

**B.    Plaintiff's Claims Against Unknown Police Officers**

In the Amended Complaint, (Doc. # 18), Plaintiff asserts several federal and state law claims against Defendants Unknown Police Officers. However, Plaintiff has yet to identify these "unknown" defendants or serve them with civil summonses and the Amended

Complaint.  Federal Rule of Civil Procedures 4(m) states, in pertinent part:

> If a defendant is not served within 120 days after the complaint is filed, the court ... must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Plaintiff filed her Complaint on December 30, 2008 (Doc. # 1) and Amended Complaint on September 30, 2009 (Doc. # 18).  After two extensions of the original discovery deadline, Plaintiff had until April 29, 2011 to complete discovery.  (Doc. # 38). Despite the lengthy and extended discovery period, Plaintiff has yet to identify Unknown Police Officers and, therefore, failed to serve them with civil summonses and the Complaint, clearly in violation of the time limit provided by Rule 4(m).  Plaintiff has been given ample time to conduct discovery and obtain the names of the unknown police officers and has not shown good cause for her failure to effectuate service.  Accordingly, any claims asserted against Defendants Unknown Police Officers must be dismissed.  *See Petty v. Cnty. of Franklin,* 478 F.3d 341, 345-46 (6th Cir. 2007).

Furthermore, although Rule 4(m) provides that the claims should be dismissed without prejudice, Plaintiff's claims will be dismissed with prejudice because even if she was allowed to re-file her claims, they would be barred by the applicable statute of limitations.  *See id.* at 346 n.3 (quoting 3 Moore's Federal Practice § 4.82[3] ("[A]ny dismissal ordered [under Rule 4(m)] after expiration of the statute of limitations for failure to establish good cause will be, in effect, with prejudice since plaintiff will be precluded from commencing a new action.")).

**C.    Section 1983 Claims**

Section 1983 specifically authorizes "any citizen of the United States or other person within the jurisdiction thereof" to pursue "an action at law [or] suit in equity" against every person who under color of state law "causes...the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]"  42 U.S.C. § 1983; *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002).  To state a claim under § 1983, a plaintiff must establish both that the defendant acted under color of state law and deprived him of a federal statutory or constitutional right.  *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

**1.    Fourth Amendment Violations**

**I.    Qualified Immunity**

Against Defendants Allen, Bacon, Higgins, Bohman and Webster, in their individual capacities, Plaintiff asserts Fourth Amendment excessive force violations.  Specifically, Plaintiff claims that the officers' use of their tasers, in connection with Hughes' known mental condition, was objectively unreasonable under the circumstances.   In response, Defendants claim they are entitled to qualified immunity.

In the context of a § 1983 action, qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This immunity is granted broadly and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in the original). Accordingly, the Court takes seriously its evaluation of whether particular defendants are entitled to qualified immunity as it is "intended to serve the public interest by permitting officials to take action with independence and without fear of consequences." *Crockett v. Cumberland College*, 316 F.3d 571, 579 (6th Cir. 2003) (internal quotations omitted).

The Court follows a two-step analysis when evaluating whether a public official is entitled to qualified immunity.[8] *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). First, the Court will inquire whether, taken in a light most favorable to the party asserting injury, the defendant violated plaintiff's constitutional right. *Id.* Second, assuming this threshold inquiry is satisfied, the Court assesses whether that right was clearly established at the time of the alleged violation. *Id.* The burden is on the plaintiff to demonstrate that qualified immunity does not apply. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)). Accordingly, for Plaintiff's claims to survive, she must not only demonstrate that a constitutional violation occurred, but also that Defendants Allen, Bacon, Higgins, Bohman and Webster are not entitled to qualified immunity.

---

[8] Ordinarily, analysis of a qualified immunity claim would include a third step–an inquiry into whether the plaintiff offered sufficient evidence to indicate that what the officers allegedly did was objectively unreasonable in light of a clearly established constitutional right. *See e.g., Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). However, in an excessive force case, in order to find a constitutional violation, the Court must determine that the defendant's conduct was objectively unreasonable, rendering the third step redundant. "Thus, qualified immunity in excessive force cases is a two-step analysis." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).

### a. Constitutional Violation

#### 1) Defendants Bacon, Higgins and Webster

Plaintiff's excessive force claim arises out of an investigatory stop of Hughes by the defendant officers and is therefore properly analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). In order to determine whether the force used to effect a particular seizure is reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. This is an "objective reasonableness" test that does not include the underlying intent or motivation of the officer. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004). Moreover, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene at that time, "rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Factors to be considered include: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* However, these factors are not an exhaustive list, and the ultimate inquiry rests on whether the seizure was reasonable under the "totality of the circumstances." *Ciminillo*, 434 F.3d at 467. Finally, the reasonableness inquiry "must embody allowance for the fact that police officers are often forced to make split-

second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

At the time of the investigatory stop, the officers suspected Hughes was in violation of K.R.S. § 527.020 which makes it a crime to carry a concealed firearm or other deadly weapon unless licensed to do so. Carrying a concealed weapon is a class A misdemeanor in the Commonwealth of Kentucky.[9] Although carrying a concealed weapon is not on its face a "severe" crime, because Hughes was a short distance away from two elementary schools, local businesses, and residential homes, the officer were certainly justified in stopping Hughes. Moreover, had Hughes survived, he would have also been charged with disorderly conduct in the second degree (K.R.S. § 525.060), menacing (K.R.S. § 508.050), and resisting arrest (K.R.S. § 520.090).

Given the fact that Hughes was armed, he posed an immediate safety threat not only to the officers but also to the school children and several bystanders in the surrounding area. Plaintiff emphasizes the fact that the officers never saw a firearm until after Hughes was restrained and searched. However, the officers had been advised of a 911 call that a man matching Hughes description was seen brandishing a firearm that he then placed into his pocket. It was certainly reasonable for the officers to believe and assume for safety purposes that Hughes was armed. Moreover, simply because the 911 caller saw Hughes remove the clip and put it into his other pocket, did not mean that the

---

[9] The officers now assert that Hughes also violated federal law which states: "It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). However, the Defendants have presented no facts to prove that Hughes actually violated 18 U.S.C. § 922(q)(2)(A) at the time of his arrest.

gun was not loaded. In fact, the gun retrieved from Hughes' person had a live round in the chamber, thus justifying their concerns. Furthermore, based on the 911 report, the officers knew that Hughes' had direct access to ammunition.

In addition to the fact that Hughes posed an immediate threat to the safety of the officers and others in the area, Hughes attempted to leave the scene and actively resisted the officers' efforts to restrain him for the entire duration of the encounter. While Plaintiff alleges that there is contradictory evidence regarding the extent to which Hughes resisted, she fails to identify this supposed conflicting evidence. The record reveals that all five officers and several witnesses consistently testified that Hughes resisted arrest. First, Hughes failed to comply with Officer Allen's instructions to show his hands and get down on the ground. Next, Hughes said, "F--- it, I'm out of here" and attempted to leave the scene.[10] Again, Hughes ignored the officers' commands to show his hands and reached into his pocket and threw a box of ammunition towards Officer Allen. Once the officers got Hughes on the ground, he resisted the officers' attempts to handcuff him. He continually put his hands underneath himself, reached towards his waistband, and attempted to push himself up off the ground. He tried to bite Officer Bacon and grab the taser from Sergeant Webster. Even after he was handcuffed, Hughes continued to kick his legs, requiring the officers to place shackles on his ankles. There is simply no evidence to refute the fact that Hughes failed to comply with every single order given to him by the police officers.[11]

---

[10] Taking the facts in a light most favorable to Plaintiff, the Court assumes that Hughes did not clench his fists and walk aggressively towards Officer Bacon at this point, but merely attempted to leave the scene.

[11] Plaintiff also contends that Hughes only "passively" resisted arrest as opposed to "actively" resisted arrest. In support of this argument, Plaintiff cites *Bryan v. Macpherson*, 630 F.3d 805 (9th Cir. 2010). In that case, the Ninth Circuit found that "[s]houting gibberish and hitting one's quadriceps is certainly bizarre behavior, but such behavior is a far cry from actively struggling with an officer attempting to restrain and arrest

Considering that Hughes was carrying a concealed firearm in a school zone and in close proximity to businesses and residential homes, the officers had a strong interest in stopping Hughes for the protection of the school children and others in the area. Moreover, Hughes behavior in reaching towards his waistband, reaching into his pocket, and throwing a box of ammunition, in addition to the fact that he actively resisted arrest and attempted to leave the scene, added a sense of urgency by the officers. It is against this background that the Court must analyze each individual officer's conduct. When examining excessive force claims, the officers' conduct should be viewed in segments, meaning that the Court must determine whether the officers' conduct at each point of the encounter was objectively reasonable and constitutionally permissible. *See Dickerson v. McClellan*, 101 F.3d 1151, 1161-62 (6th Cir. 1996).

Officer Bacon arrived on scene at approximately the same time as Officer Allen. Initially, he drew his firearm and commanded Hughes to show his hands and get down on the ground. Hughes began reaching towards his waistband and pockets, where officers believed he had a gun, shuffling his feet, and repeating the word "dynamite." From the start, Hughes was noncompliant with all of the officers' commands. Believing Hughes to be a "Signal 2," Allen ordered Bacon to holster his gun and draw his taser. At this point, Bacon stopped giving commands and let Allen take the lead. After repeatedly ignoring Allen's commands, Hughes stated, "F--- it, I'm out of here," and attempted to leave the scene. At this point, Bacon deployed his taser in probe mode and struck Hughes in the

---

an individual." *Id.* The plaintiff's actions in *Bryan* are clearly distinguishable from the present case. First, Hughes attempted to leave the scene. Thereafter, once the officers attempted to physically restrain Hughes, he *actively* fought the officers' efforts. He tried to push himself off the ground, bite Officer Bacon, grab Sergeant Webster's taser and kicked his legs.

upper left shoulder/chest area, but it had no visible effect.  Believing that the first cycle had poor or no connectivity, he cycled the taser again.[12]  Again, it had no visible effect on Hughes, so Bacon dropped the taser and opted for another method of force.  Considering the circumstances confronting Bacon at the time he deployed his taser, his actions were objectively reasonable in order to stop an armed suspect attempting to leave the scene and evade arrest.

Officer Higgins arrived on scene soon after Officers Allen and Bacon.  He positioned himself behind Hughes.  Higgins observed Hughes ignore Allen's instruction to get down on the ground and move his hands towards his waistband.  Higgins fired his taser in probe mode at Hughes' back only after Hughes attempted to leave the scene and reached into his pocket, where officers believed he had a gun, and threw a box of ammunition towards Allen.[13]  When the taser appeared to have no effect on Hughes, Higgins switched out the cartridge, believing it to be faulty, and fired the taser a second time.  Given that Hughes posed an immediate threat to the safety of the officers and others and was attempting to leave the scene, Higgins' actions were objectively reasonable under the circumstances presented.

Thereafter, when Hughes' attention was turned towards Higgins, Bacon and Bohman decided to move in and physically force Hughes down to the ground in order to avoid a deadly force situation.  Once on the ground, Hughes resisted the officers' attempts to handcuff him and tried to push himself up off the ground.  He also continued to reach

---

[12] As stated above, the officers learned that lack of reaction to a taser cycle may indicate poor or no connection, low probe spread, or low muscle mass contact.

[13] The deployment of Higgins' first taser cycle was almost simultaneous to Bacon's second cycle.

towards his waistband.  At one point, Hughes attempted to bite Bacon's hand.  During the struggle, Higgins used his taser in drive stun mode a total of four times.  The first three times, Higgins applied the taser over Hughes' clothing, but on the final time, believing that Hughes' thick clothing was preventing the taser from working properly, he applied it to an exposed patch of skin.  When Hughes continued to resist the officers' efforts to handcuff him, Higgins turned off the device knowing that it was ineffective.  These four tasings occurred during the first forty-seven seconds that Hughes was on the ground.  According to witnesses, the struggle on the ground lasted approximately five minutes.  There has been no evidence presented that any of the tasers were deployed after the officers had gained control of Hughes.  Given the fact that Hughes was actively resisting arrest, was reaching towards his waistband, which the officers reasonably perceived to be reaching towards a firearm, and posed a serious threat to the officers and others in the area, Higgins' use of his taser in drive stun mode was objectively reasonable under the circumstances.

During the struggle, Sergeant Webster also deployed his taser in drive stun mode a total of four times.  The first time Webster lifted up Hughes shirt and drive stunned Hughes in the lower back.  When Hughes continued to fight the officers, he drive stunned Hughes in the right hip.  However, Hughes was able to grab Webster's hand and the taser lost contact with Hughes' body.  Next, Webster drive stunned Hughes in the lower back, but due to Hughes' movements, the taser once again lost contact with Hughes' body.  Webster disengaged the taser and reapplied it once more.  Realizing the tasings were not having any effect on Hughes, Webster dropped his taser.  These four tasings occurred during the same time period that Higgins used his taser in drive stun mode.  For the same

reasons stated above regarding Higgins' use of his taser in drive stun mode, Webster's use of force was also objectively reasonable. Plaintiff argues that the "overwhelming officer presence" eliminated the need for these additional taser deployments. However, a reasonable use of force does not become unreasonable per se simply because more than one officer is responding with reasonable force. *See Gaddis v. Redford Township*, 364 F.3d 763, 777 (6th Cir. 2004) (Police officers' decisions to use their weapons to respond to plaintiff's attack were individually justifiable, and the fact that there were two of them responding simultaneously, thereby producing a duplicate number of shots fired, does not change the reasonableness of their conduct.).

Instead of addressing the officers' use of force in connection with the *Graham* factors outlined above, Plaintiff alleges that the officers' use of force was excessive in light of Hughes' mental illness.[14] However, Plaintiff's mental status is not the only the factor that the Court must consider. *See Gaddis*, 364 F.3d at 775 ("[A] suspect's apparent mental state is *one* of the facts and circumstances of the particular case ... that should be considered in weighing an excessive force claim."). Moreover, when an EDP is armed, his "diminished capacity [does] not make him any less of a serious threat to the [officers]." *Summerland v. Rinesmith*, 240 F. App'x 70, 77 (6th Cir. 2007). Therefore, a police officer is allowed to use force against a mentally ill suspect so long as the *Graham* factors otherwise indicate that the use of force is objectively reasonable. *See Johnson v. Combs*, No. 4:04-CV-019, 2005 WL 2388274, at *5 (W.D. Ky. Sept. 27, 2005) ("Whether or not

---

[14] The cases cited by Plaintiff in support of this proposition are easily distinguishable from the instant case. In each of those cases, the subject was unarmed, not resisting, had done nothing to suggest that he intended to harm the police officers or others, and was not suspected of any serious crime.

[plaintiff] was mentally ill, he posed an immediate threat to the Troopers when he charged at them with a deadly weapon."). Consequently, Plaintiff has failed to demonstrate that Defendants Bacon, Higgins and Webster violated Hughes' constitutional right to be free from excessive force.

### 2) Defendants Allen and Bohman

Plaintiff asserts that Defendants Allen and Bohman violated Hughes' Fourth Amendment right against the use of excessive force by failing to intervene on behalf of Hughes, whose rights constitutional rights were being violated by the other officers.[15] The Sixth Circuit has held that a police officer can be held liable for the failure to protect an individual from the use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). In order to establish an excessive force claim based upon a failure to intervene, the plaintiff must demonstrate that the officer failed to act to prevent the use of excessive force when he: (1) observed or had reason to know that excessive force would be or was being used, and (2) had the opportunity and the means to prevent the harm from occurring. *Id.* For purposes of addressing this claim, the Court assumes *arguendo* that Defendants Higgins and Webster used excessive force in violation of Hughes' Fourth Amendment rights.[16]

---

[15] The Court recognizes that Plaintiff raised this assertion for the first time in her response and did not allege a Fourth Amendment excessive force violation based upon the failure to intervene in her Amended Complaint (Doc. # 18). However, the Court will address Plaintiff's claims against Officers Allen and Bohman on the merits.

[16] For this analysis, the Court will not assume that Defendant Bacon violated Hughes' Fourth Amendment rights. Given the existing circumstances at the time Bacon deployed his taser, including the fact that Hughes was unsecured, unwillingly to comply with the officers' commands to show his hands and get on the ground, and attempting to leave the scene, Bacon's use of force was certainly justified. Bacon only cycled his taser twice, after the first cycle proved to be ineffective, and, when Hughes continued to resist, Bacon dropped his taser and attempted to physically force Hughes down to the ground in order to avoid a deadly-force situation.

Plaintiff has failed to prove that Officers Allen and Bohman (1) observed or had reason to know that excessive force was being used, and (2) had the opportunity and the means to prevent the harm from occurring. While Officer Higgins' fired his first two taser cycles before the other officers attempted to wrestle Hughes to the ground, Higgins was standing behind Hughes, and Plaintiff has failed to present any evidence that Allen and Bohman even saw Higgins before he attempted to deploy his taser. Moreover, because Allen and Bohman were standing in front of Hughes, there is no way that they could have prevented Higgins from firing his taser.

The additional tasings by Higgins and Webster occurred while the officers were engaged in a physical struggle to restrain Hughes. Again, Plaintiff has presented no evidence that Allen and Bohman even witnessed these additional tasings or had the opportunity to prevent them. Indeed, Allen testified that at the time they were struggling to get Hughes handcuffed, he did not know if any of the other officers were tasing Hughes and, if they were, he was not paying attention to them. His main focus was on getting Hughes left arm behind him so he could be restrained. Although, at one point, Allen remembered Bacon yelling out that he felt one of the tasings. Likewise, Bohman testified that "my primary focus was on [Hughes'] left arm so that's really what I was focused on. As far as the tasing, it was more I heard the arc of the taser. So I really wasn't looking around to see what everybody else was doing. My focus was on [Hughes]." (Doc. # 55-1, at 11). Since Hughes was resisting arrest, and Allen and Bohman were physically trying to restrain him, they did not have the opportunity to prevent the additional tasings. Accordingly, Plaintiff has also failed to prove that Defendants Allen and Bohman violated Hughes' constitutional right to be free from excessive force.

**b.     Clearly Established Right**

For the sake of completeness, the Court assumes *arguendo* that Defendants used excessive force in violation of Hughes' Fourth Amendment rights and, thus, moves to the second step of the qualified immunity analysis.   A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "In the excessive force context, it is not enough for a plaintiff to demonstrate that an officer's use of force exceeded the objective standard of reasonableness articulated in *Graham*. Rather, qualified immunity is proper unless 'it would be clear to a reasonable officer' that his use of excessive force 'was unlawful in the situation he confronted.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194 , 202 (2001)) (internal citation omitted).

A right is clearly established if there exists "binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002)).   The United States Supreme Court has expressly held that a person who has been the victim of excessive force in the context of an arrest or investigatory stop has a claim based on the Fourth Amendment.  *Graham*, 490 U.S. at 394.   Plaintiff concludes that Defendants fail the second step of the qualified immunity inquiry because the right of an arrestee to be free from excessive force is a clearly established right (Doc. # 67, at 13).  While the Court agrees with Plaintiff's general statement of law, it does not accurately represent the Court's inquiry at this step.   The

question is whether Hughes' right to be free from excessive force *given the facts of this case* is clearly established, such that a reasonable officer would know his use of force was unlawful in the seizure of Hughes.

The Sixth Circuit has held that "the gratuitous or excessive use of a taser would violate a clearly established constitutional right." *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008). In *Landis*, the Court held that the officers "should have known that the use of a taser in stun mode, in rapid succession on a suspect who is surrounded by officers, in a prone position in a muddy swamp, who has only one arm beneath him [and one arm in a handcuff], and who has just been struck several times with a baton would be a violation of a constitutional right." *Id.* at 464. The Court specifically noted that the arrestee "was not actively resisting arrest or posing a threat to anyone in the vicinity." *Id.* at 461. On the other hand, the Sixth Circuit has found that "the use of a taser in order to avoid a dangerous situation or the resort to even greater force [does] not violate clearly established law." *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045 (6th Cir. 1992)). Recently, the Sixth Circuit found that the use of thirty-seven ECD activations, baton strikes, and repeated pepper spray usage against an *unarmed* subject was objectively reasonable because the subject actively resisted arrest and posed a serious threat to himself and others. *Williams v. Sandel*, Nos. 10-5520, 10-5521, 2011 WL 2790474, at *9 (6th Cir. July 13, 2011).

In the present case, there is simply no evidence that the officers gratuitously tased Hughes after he was handcuffed and under control. The initial four tasings occurred when Hughes, an armed and potentially dangerous suspect, ignored the officers' commands and

attempted to leave the scene.  Moreover, Hughes was within close proximity to two elementary schools, local businesses and residential homes.  In fact, many bystanders stood outside of their homes to witness the incident.  The second round of tasings occurred while Hughes actively resisted arrest.  Furthermore, Hughes continued to reach towards his waistband throughout the struggle, where the officers believed he had a firearm.  Clearly, the officers use of the taser to avoid a dangerous situation or the resort to an even greater use of force did not violate clearly established law.  Accordingly, Plaintiff has failed to demonstrate that it was clear to Officers Bacon, Higgins, and Webster that their use of excessive force was unlawful in the situation they confronted.  Moreover, because Plaintiff has failed to demonstrate that it was clearly established at the time of Hughes' seizure that the type and amount of force used by Bacon, Higgins and Webster was excessive under the circumstances of this case, it also could not be clearly established that Allen and Bohman were required to intervene on Hughes' behalf.

## ii.    Municipal Liability

Plaintiff asserts that the City's failure to adequately train its police officers in the proper exercise of force on mentally disturbed individuals, including the ability to adequately recognize the effects of tasings on such persons, constitutes deliberate indifference to the rights of such persons.  The liability of local government entities cannot be premised on a theory of *respondeat superior*.  *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996).  Therefore, a governmental entity can only be held liable on the basis of its own conduct.  *Id.* at 507.  To prevail on a § 1983 claim against a municipality, a plaintiff must establish:  (1) that he suffered a deprivation of a constitutionally protected interest; and (2) the alleged deprivation was caused by an official policy, custom, or usage

of the municipality. *Monell v. New York Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978).

Because Defendants Allen, Bacon, Higgins, Bohman and Webster did not violate Hughes' Fourth Amendment rights, Plaintiff cannot rely on Defendants' conduct to also establish a claim of municipal liability against the City of Covington. *See Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 404 (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."). However, once again, the Court assumes *arguendo* that Defendants used excessive force in violation of Hughes' Fourth Amendment rights and, therefore, will address Plaintiff's claim against the City of Covington on the merits.

Under § 1983, a municipality can only be held liable if the plaintiff establishes that the injury suffered was a direct result of the city's official policy or custom*. Monell*, 436 U.S. at 694-95. A claim based on inadequate police training only satisfies § 1983 liability where (1) the training program at issue is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the municipality's *deliberate indifference*; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury. *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (emphasis added). Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997). "[A] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without

showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond." *Id.* However, the Supreme Court has left open the possibility that "in a narrow range of circumstances," the unconstitutional consequences of failing to train could be so patently obvious that a city would be held liable without proof of a pattern of pre-existing violations. *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011) (citing *City of Canton*, 489 U.S. at 390). Plaintiff relies on this "single-incident" theory of liability.

In support of her position, Plaintiff offers the testimony of the defendant officers that they were not provided training in dealing with the mentally ill. Furthermore, Plaintiff contends that the officers testified that they were also not aware of any policies and procedures dealing with the mentally ill. However, despite the officers failure to recall the specific training they each received, the evidence reveals that each officer received training regarding interaction with EDPs, including the use of tasers with EDPs, at the Academy, during a six-month probationary period where each officer trained with a FTO, and in an eight-hour taser training course taught by Sergeant Twehues, a certified taser trainer. Furthermore, many of the officers were able to articulate how to respond when dealing with EDPs. They stated that an officer should avoid being confrontational, try to de-escalate the situation, lower his voice, keep commands simple, and use a lower level of force.[17] Moreover, Officer Bohman testified that he learned if EDPs are armed, they can

_____

[17] These objectives appear to be consistent with the testimony of Plaintiff's expert, Ken Katsaris, who testified that "[r]ecognized concepts call for a response that 'calms' the situation as opposed to raising the subject person's agitation level. Arriving without lights and siren, using non-threatening gestures, keeping a distance, using officers to contain but not constrain the person until one officer has attempted contact, communication and control are the recognized procedures for dealing with the mentally ill." (Doc. # 57-1, at 154).

be very unpredictable and need to be disarmed as quickly as possible.[18]  Certainly, the evidence demonstrates that the officers received training on dealing with EDPs, so the question becomes whether the training was inadequate.

"That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *City of Canton*, 489 U.S. at 390.  Instead, the focus should be on the adequacy of the training program and whether "the identified deficiency in a city's training program [is] closely related to the ultimate injury."  *Id.* at 391. Furthermore, it is not enough to argue that the City should have required "better or more training," because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program ... ."  *Id.*

Plaintiff offers the expert report of Ken Katsaris in order to support her claim that the City's training was inadequate.  In his preliminary report dated April 28, 2010, Katsaris offered the following opinion:

> While I do not have the training records to confirm the level of knowledge of the training of the involved officers for handling the mentally ill or the level of understanding imparted to them about the success or use of the ECD when dealing with the mentally ill, it appears from their actions that this training was either not provided or insufficient, and therefore would support a level of deliberate indifference to training by the Covington Police Department.

(Doc. # 57-1, at 156).  However, in his deposition on May 27, 2011, after being provided the curriculum from the Kentucky Department of Criminal Justice Training Academy, he testified, "if these objectives are relevant to those officers and they got that training then

---

[18] Katsaris also testified that when an EDP may be armed or dangerous, the most important objective is containment, as you do not want the suspect to get away.  (Doc. # 57-1, at 58).

they [the City] probably, certainly meet the hurdle of not being deliberately indifferent to training." (*Id.* at 135). Plaintiff attempts to disregard this amended opinion by stating that Katsaris did not provide a "substantive review of the curriculum, length or frequency." (Doc. # 67, at 24). Besides providing a general overview of Katsaris' testimony, Plaintiff does not identify any specific deficiency in the City's training program.

Given the testimony of the officers and Katsaris' amended opinion, the City's training on dealing with EDPs was adequate. The officers discussed in detail how to respond when dealing with mentally disturbed suspects, and their testimony was consistent with the objectives identified by Katsaris. However, even if the City's training was inadequate and amounted to deliberate indifference to the rights of EDPs with whom the officers come into contact with, Plaintiff has not shown that the City's failure to train was closely related to or actually caused Hughes' injury. *See Hill*, 884 F.2d at 275 (citing *City of Canton*, U.S. 489 at 388).

The evidence reveals that the Defendant officers followed the well-recognized objectives in responding to EDPs when they approached Hughes. First, it is important to note that none of the officers knew Hughes was a paranoid schizophrenic or had any prior experience dealing with Hughes. Moreover, based upon the 911 call, the officers reasonably believed that Hughes was armed and dangerous. Once Allen suspected that Hughes was possibly a "Signal 2," he advised Bacon to holster his gun and use his taser. Allen stepped away from his cruiser and moved parallel to Hughes, lowering his voice and using hand gestures to try and get Hughes on the ground. Moreover, Bacon stopped giving additional commands so Hughes would not be confused and could listen solely to Allen. Meanwhile, the other officers positioned themselves around Hughes in order to

34

contain but not constrain him. The officers did not use their tasers until Hughes continued to ignore their commands and attempted to leave the scene. At this point, the officers deployed their tasers and began making a forcible arrest, as their training taught them to disarm the subject as soon as possible. Thus, the officers responded appropriately when dealing with Hughes, and any inadequate training by the City was not closely related to or actually caused Hughes' injury. Consequently, the City of Covington is not subject to municipal liability for inadequate training.

### 2. Fourteenth Amendment Violations

In her Amended Complaint, Plaintiff also alleges that Defendants violated Hughes' Fourteenth Amendment rights "to due process of law and to his liberty." (Doc. # 18, at ¶¶ 77, 88). However, Plaintiff has failed to raise any additional facts other than those relating to her Fourth Amendment excessive force claim. The Supreme Court has made clear that "*all* claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395 (emphasis in the original). More recently, the Court noted that "*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). As stated above, since the officers' use of force occurred during the course of an investigatory stop of Hughes, Plaintiff's claim arises solely

under the Fourth Amendment. *See Henderson v. Reyda*, 192 F. App'x 392, 396 (6th Cir. 2006) (where excessive force claim arose from officer's seizure of Plaintiff's person, Plaintiff could only proceed under the Fourth Amendment and not the Fourteenth Amendment). Accordingly, Plaintiff's Fourteenth Amendment due process claims are hereby dismissed.

## D.    State Law Claims

Plaintiff also asserts state law battery claims against Defendants Bacon, Higgins and Webster and negligence claims against Defendants Allen, Bacon, Higgins, Bohman and Webster. Under Kentucky law, qualified immunity protects "the discretionary acts of peace officers performed in an official capacity, thereby shielding them 'from [ ] liability for good faith judgment calls made in a legally uncertain environment.'" *Haugh v. City of Louisville*, 242 S.W.3d 683, 685 (Ky. Ct. App. 2007) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). Similar to federal qualified immunity, the plaintiff has the burden to demonstrate that the officers' actions were not performed in good faith. *James v. Wilson*, 95 S.W.3d 875, 905 (Ky. Ct. App. 2002). The plaintiff can establish bad faith by showing that the officer "*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the [plaintiff's] rights or that the officer took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury ... ." *Id.* (quoting *Yanero*, 65 S.W.3d at 523) (internal quotations omitted) (emphasis in the original).

Without citing any authority concerning the elements of a state law battery or negligence claim, Plaintiff merely alleges that "[i]t is reasonable that a juror could conclude

that the facts presented show that the Officers exceeded the bounds of force reasonably needed to affect the arrest and thereby were both negligent and caused [Hughes] to be battered." (Doc. # 67, at 26). Simply put, Plaintiff merely alleges a breach of the officers' duty not to use excessive force. Thus, this claim follows the excessive force analysis.

The Court has already found that the officers used reasonable force in the course of Hughes' arrest and, therefore, did not violate Hughes' Fourth Amendment rights. Therefore, Plaintiff's state law claims survive only if the officers acted *with the malicious intention* to cause a deprivation of Hughes' constitutional rights or other injury. *See Haugh*, 242 S.W.3d at 685. Plaintiff has failed to demonstrate that any of the officers acted with the malicious intention to harm Hughes. Accordingly, Defendants Allen, Bacon, Higgins, Bohman and Webster are also entitled to qualified immunity on Plaintiff's state law claims.

### III.    CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)    Defendant Steve Bohman's Motion for Summary Judgment (Doc. # 56), Defendants William Webster's and Eric Higgins' Motion for Summary Judgment (Doc. # 58), Defendant City of Covington's Motion for Summary Judgment (Doc. # 59), and Defendants Ron Allen's and Robert Bacon's Motion for Summary Judgment (Doc. # 60) are hereby **GRANTED**;

(2)    Plaintiff's federal and state law claims are hereby **DISMISSED WITH PREJUDICE**; and

(3)    This case is hereby **STRICKEN** from the active docket of this Court.

This 5th day of January, 2012.



Signed By:

*David L. Bunning*

United States District Judge